IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 6, 2020

**ANGELA BREWER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Tipton County**
**No. 8065      Joe H. Walker, III, Judge**
_____

**No. W2020-00108-CCA-R3-PC**
_____

A Tipton County jury convicted Petitioner, Angela Brewer, of first degree premeditated murder, and the trial court sentenced Petitioner to life. Petitioner appealed, and this court affirmed her conviction and sentence. Petitioner filed a pro se petition for post-conviction relief, and after a hearing, the post-conviction court denied relief. On appeal, Petitioner argues that the post-conviction court erred in denying relief on her claim that she received ineffective assistance of counsel based on trial counsel's failure to consult with Petitioner regarding the evidence and to secure a firearms expert to testify for the defense. Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Jeremy T. Armstrong, Covington, Tennessee, for the appellant, Angela Brewer.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Erik Haas, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**<u>Factual and Procedural Background</u>**

*Trial*

On direct appeal, this court provided the following summary of the facts at trial:

On December 8, 2013, at approximately 5:54 a.m., [Petitioner] called Tipton County 911 and stated that she thought she had accidentally shot her husband. Deputy Chad McCommon, of the Tipton County Sheriff's Office, was among the officers dispatched to [Petitioner's] residence. Deputy McCommon testified that [Petitioner] and her children were present at the home when he arrived. Deputy McCommon found the victim, Stan Brewer, deceased in bed. Mr. Brewer appeared to have a gunshot wound to the back of his head. Deputy McCommon found a .410 shotgun on the pillow beside the victim's head. Deputy McCommon testified that when he arrived at the scene at approximately 6:10 a.m., the victim's face and hands were "a bluish-purplish color."

Deputy McCommon testified that [Petitioner] stated that she had shot the shotgun in the past and that she had had problems unloading it. Deputy McCommon overheard [Petitioner] tell her daughter that it was an accident and that she was sorry. Deputy McCommon described [Petitioner] as "very sporadic . . . [n]ervous, upset, crying. Then she would calm down for a while, and it just—and it would repeat the whole time that we were [at the scene]."

Deputy Randy Lee also responded to the scene. He also testified that the victim's "skin tone was gray, kind of [a] slight bluish color." The victim's hand "seemed stiff," like rigor mortis had apparently set in. Lieutenant Daniel Walls, who also responded to the scene, also testified that the victim appeared to have rigor mortis in his hand. Lieutenant Walls also testified that he smelled what he described "from [his] experience, [as] death."

Lieutenant Walls testified that a .410 single-barrel shotgun was lying on the bed beside the victim's head. The shotgun had a lever that released the barrel to load a shell. After it was loaded, the barrel had to be locked into place, the hammer cocked, and the trigger pulled to fire it. In order to unload the shotgun while the hammer was thusly pulled back, one would have to hold the trigger while releasing the hammer to then open the barrel and pull out the shell.

Karen Chancellor, the Chief Medical Examiner for Shelby County, performed an autopsy on the victim. Dr. Chancellor testified that the victim died of a shotgun wound to the back of his head. She observed sooting inside the wound, which indicates "that the end of the barrel of the gun was

next to the skin when the gun was fired." Dr. Chancellor testified as follows:

> If you have the end of the barrel of the gun *held tightly* against the skin, when it's fired sooty residues are released as well as the projectiles, either a bullet, or a shotgun wound, pellets. Those sooty residues, if they are deposited inside the wound, that tells us that it's a contact wound.
>
> As the barrel moves away from the skin, there may be sooty residues on the outer parts of the wound, and there may be what we call powder stippling. That's when flakes of powder impact the skin and cause tiny abrasions. So that's at a further distance than a contact wound. There's no evidence of powder stippling here.

(emphasis added).

Dr. Chancellor also observed "wadding" in the victim's brain, which "confirms that this is a very close-range wound." Dr. Chancellor determined that the manner of the victim's death was homicide.

The victim's brother, Albert Thomas Brewer, testified that he had been hunting with the victim on the afternoon before the victim's death. Mr. Brewer testified that he and the victim hunted regularly and that [Petitioner] had hunted with them on one occasion. He testified that [Petitioner] had taken a hunter safety course with the victim. He testified that he had seen [Petitioner] shoot the .410 shotgun before. He testified that [Petitioner] had "target practiced a lot" with the shotgun.

Special Agent Mark Reynolds, of the Tennessee Bureau of Investigation ("TBI"), interviewed [Petitioner]. [Petitioner] stated that she woke up at approximately 5:30 a.m. and heard a "noise [that] sounded like something falling or like a crash." She stated that the noise scared her. She took the .410 shotgun out of a gun cabinet in her bedroom. She stated that it was "the gun that [she was] familiar with" and that the victim had "show[n] [her] how to shoot it several times." She went to the kitchen to get a shotgun shell and loaded the shotgun. She looked outside and did not find anything. She returned to the bedroom and laid the shotgun on the pillow. She attempted to wake the victim to ask him for help, and she heard a "pop or boom." She turned on the bedroom light and saw blood.

- 3 -

She then called 911. [Petitioner] stated that she was not holding the shotgun when it fired. She stated,

> I had laid it on my pillow but kept my hand on it because I noticed it pointing at [the victim]'s head. I moved the gun because I remembered the safety of never point a gun at anything you don't intend to shoot. I did not think it was pointing at his head, and I don't know how it went off.

Special Agent Reynolds testified that the shotgun is "very simple" to operate. He testified that [Petitioner] was upset during his interview with her, and she maintained that the shooting was an accident.

A forensic examination of the shotgun by the TBI revealed that there were no defects with the shotgun and that it operated as intended by the manufacturer. Special Agent Eric Warren, of the TBI, tested the shotgun for accidental discharge, including dropping the firearm and hitting it with a mallet while the hammer was cocked, and "in no circumstance did [he] get the firearm to discharge." Special Agent Warren testified, "[t]he only way that I was able to get the hammer to fall that would result in a discharge would be by pulling the trigger." Special Agent Warren also examined the pillowcase that the victim's head was lying on. He testified that the soot pattern on the pillowcase was consistent with the medical examiner's finding that the shotgun wound was a contact wound.

Four witnesses testified for the defense. Leah Cochran attended church with [Petitioner] and babysat [Petitioner's] children. Ms. Cochran testified that [Petitioner] "seemed like a very good mother" and that she had a reputation for honesty.

Sarah Harmon, a long-time family friend, had lived with [Petitioner's] family in 2013. She testified that [Petitioner] "loved her family very much" and that [Petitioner] and the victim had a "loving" family. Ms. Harmon found the allegation that [Petitioner] intentionally shot her husband to be "shocking."

Bill Waits, another friend from church, described [Petitioner] as "[s]weet, kind[,] gentle, [and a] good mother." He believed the allegation was out of character for [Petitioner].

- 4 -

Sherry Hudson had been a professor at Dyersburg State Community College and taught a class with [Petitioner] in 2010. Ms. Hudson was a mentor to [Petitioner]. She testified that [Petitioner] was a conscientious student and "was very dedicated to her family." Ms. Hudson "always found [Petitioner] to be very honest and trustworthy, very forthcoming."

*State v. Angela Denise Brewer*, No. W2017-00124-CCA-R3-CD, 2018 WL 3689495, at *1-3 (Tenn. Crim. App. July 31, 2018). On appeal, Petitioner challenged the sufficiency of the evidence, but this court affirmed the judgment of conviction. *Id.*, at *5.

*Post-conviction proceedings*

Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the post-conviction court held a hearing on the merits of the petition. Petitioner testified that the defense theory at trial was that the shooting was an accident, explaining that she "laid the gun on the pillow and leaned on it" before it went off. Petitioner stated that trial counsel initially told her that he was obtaining a firearms expert to testify on behalf of the defense but that "towards the end," trial counsel told her that "it was not necessary[.]" She recalled that trial counsel requested that the trial be continued several times in order for him to find this expert.

Regarding her level of communication with trial counsel, Petitioner testified that she went to counsel's office two or three times during the two years she was out on bond before trial but stated that her visits were "cut short for one reason or another." She said that she and trial counsel never went over the evidence against her thoroughly. Petitioner testified, "We didn't actually speak very often. When we did, we did speak here in the courtroom, because I had to be here once a month[.]" Petitioner agreed, however, that she was not hindered by being incarcerated and had "every opportunity" to meet with trial counsel.

Trial counsel testified that he had practiced criminal defense for approximately thirteen years. Trial counsel agreed that, prior to Petitioner's trial, he filed several motions for continuance in order to secure a firearms expert for the defense but explained that he was not able to find one. Trial counsel stated that he went to a gun shop and spoke to an individual about acting as an expert but that the individual was "not interested in it." Trial counsel noted that the defense theory at trial "wasn't necessarily that it was a malfunction" that caused the gun shot and that the State's own firearm expert "was going [to] say . . . that the way the trigger mechanism is, it doesn't have a safety on it. So[,] if it's cocked and you touch the trigger it can go off."

Trial counsel testified that Petitioner was released on bond during the pendency of the proceedings and that, when Petitioner called him, he would meet with her. Although he could not recall the number of times he met with Petitioner, he stated that he tried to be available to meet "whenever she wanted[.]" Trial counsel recalled that he went to Petitioner's home once or twice to look at the crime scene. Trial counsel said that he went over Petitioner's proposed testimony and prepared her to testify. He stated that Petitioner ultimately decided not to testify but noted that Petitioner made a statement to police "that was basically what . . . our defense was namely that she put the gun down. When she reached for it, it went off[.]" Trial counsel noted that Deputy McCommon "testified that he basically was with [Petitioner] the whole time from . . . when they came to the house, and that she was distraught" and like she was "going through a traumatic experience." Trial counsel recalled that he was able to cross-examine the State's firearms expert and that the expert agreed that, if the gun was cocked and someone touched the trigger, it could "go off," which was consistent with the defense theory of the case.

The post-conviction court took the matter under advisement and subsequently entered a written order denying relief. Accrediting the testimony of trial counsel, the post-conviction court found that trial counsel was not deficient in failing to meet with Petitioner. The court further found that Petitioner had failed to articulate how the outcome of trial would have been different if she had consulted more extensively with counsel. The post-conviction court also determined that Petitioner failed to show how a firearms expert would have been beneficial to her defense. Accordingly, the post-conviction court found that Petitioner failed to establish that she was denied the effective assistance of counsel.

Following the entry of the post-conviction court's order, Petitioner filed an untimely notice of appeal. Upon motion by Petitioner, however, this court agreed to waive the thirty-day deadline for filing a notice of appeal in the interest of justice.

**Analysis**

*Standard of review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40

S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Right to effective assistance of counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

<u>Failure to consult with Petitioner</u>

On appeal, Petitioner contends that trial counsel rendered ineffective assistance by failing to consult with her regarding the evidence. Petitioner asserts that trial counsel failed to discuss possible defenses and the weaknesses in the State's case, leaving her unable to participate in her own defense.

Petitioner testified, however, that she was out on bond for two years prior to trial and agreed that she had "every opportunity" to meet with trial counsel. Trial counsel also testified that he met with Petitioner whenever she wanted and that he went over Petitioner's proposed testimony and prepared her for trial. Trial counsel met with Petitioner at his office, during court appearances, and he went to her home to view the crime scene. Trial counsel and Petitioner discussed the theory of defense that the shooting was accidental. Petitioner has failed to show that trial counsel's performance was deficient in failing to communicate with her. Additionally, we agree with the post-conviction court that Petitioner failed to establish prejudice, *i.e.*, that the results would have been different if trial counsel had consulted more extensively with Petitioner. *Strickland*, 466 U.S. at 694. The post-conviction court properly denied relief on this claim.

<u>Failure to secure a firearms expert</u>

Petitioner additionally contends that trial counsel rendered ineffective assistance based on counsel's failure to secure a firearms expert to testify for the defense. She argues that trial counsel requested a continuance multiple times for this purpose but that counsel "never requested funding or . . . talk[ed] to more than one gunsmith."

Trial counsel testified that, although he initially attempted to locate a firearms expert, he ultimately decided that an expert was not necessary. Trial counsel explained that the defense theory was not that the gun had malfunctioned but that Petitioner had accidently touched the trigger causing it to fire. Counsel testified that, through cross-examination of the State's firearm expert, he showed that the expert's testimony was consistent with the defense theory. The post-conviction court accredited trial counsel's testimony, and this court will not re-weigh that assessment on appeal. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Moreover, a petitioner who claims ineffective assistance of counsel based on a failure to call a witness must bring in a

witness to testify at the post-conviction hearing for it is not the trial court's or appellate court's prerogative to speculate as to what the witness would say. *Id.* at 757. Because Petitioner did not present a firearms expert at the post-conviction hearing, she failed to establish the prejudice requirement mandated by *Strickland*. *Id.* at 758. Thus, the post-conviction court properly denied relief on this claim.

## Conclusion

The judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE